## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ASISTA IMMIGRATION ASSISTANCE, INC., et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> TAE D. JOHNSON, Acting Director, in his official capacity, et al., <br><br> *Defendants*. | Case No. 3:20-cv-00206-JAM <br><br> Judge: Hon. Jeffrey A. Meyer |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO RENEW STAY

On July 2, 2021, Plaintiffs and Defendants submitted a joint motion seeking two additional business days to reach agreement on the terms of a continued stay in this case. That motion, filed by Defendants' counsel, stated: "If the parties are not able to reach agreement by July 7 on the terms of a continued stay, they agree that the stay should be lifted, and that this Court should proceed to resolve the pending motions for summary judgment." Dkt. 71, at 1. At 11:59 PM on July 7, after the parties failed to reach agreement, Defendants unilaterally moved this court to renew the stay, urging this Court *not* to "proceed to resolve the pending motions for summary judgment." *Id.*

Plaintiffs vehemently oppose that motion. Continuing to hold this case in abeyance will not protect Plaintiffs' interests or those of the noncitizens whom they and their clients serve. Instead, Plaintiffs and the individuals to whom they provide assistance will suffer continued harms from the illegal policy being challenged in this case, while Defendants hold out the promise of a new policy on stays of removals about which they have shared no information and no firm deadline

1

for its announcement.  Contrary to Defendants' assertion, the issuance of any new policy on stays of removal will not necessarily resolve Plaintiffs' challenge, and if it does not, Plaintiffs and their clients will have suffered continuing harm for no reason at all.  Plaintiffs respectfully request that this Court deny Defendants' motion and resolve the pending motions for summary judgment.

ICE Directive 11005.2 ("the Albence Policy") made it easier for ICE to deport noncitizen victims of crime who have provided valuable assistance to U.S. law enforcement while they are waiting to learn whether they will be granted a "U visa," a special visa established by Congress to prevent such individuals from being deported.  *See* Dkt. 34, ¶¶ 46-52.  Individuals removed from the United States under the Albence Policy—who may turn out to have been fully entitled to remain in the United States—can suffer grave harms from their premature removal, including separation from family members in the United States, a risk of violence or death in their home countries, and the triggering of new inadmissibility grounds by the deportation that can prevent their reentry into the United States even if their U visa is ultimately granted.  *Id.* ¶ 53.

This new policy was issued by a purported Acting Director of ICE, Matthew Albence, who Defendants have conceded had no legal authority to be the Acting Director when he established the policy.  *See* Dkt. 45, at 2-3.  Albence was, moreover, installed in that role by a purported Acting Secretary of Homeland Security who himself had no legal authority to be the Acting Secretary— as every court to decide the matter has concluded.[1]  Nevertheless, this harmful and illegal new policy has been in force for nearly two years.

---

[1] Five different courts have concluded that Kevin McAleenan, who purported to appoint Matthew Albence as ICE's Deputy Director, was never a valid Acting Secretary of Homeland Security—adopting the position advanced by Plaintiffs in their supplemental briefing here.  *See* Dkts. 57, 59; *CASA de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020); *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520 (N.D. Cal. 2020); *Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117 (E.D.N.Y. 2020); *La Clínica de La Raza v. Trump*, No. 19-4980, 2020 WL 6940934 (N.D.

Despite this Court's January 2021 order and the parties' subsequently filed status report indicating their intention to pursue settlement, Defendants have not negotiated in good faith with Plaintiffs over a settlement in this case.   Moreover, while the case has been stayed, ICE has continued deporting U-visa petitioners under questionable interpretations of the parties' March 2021 stay agreement.   During the pendency of the stay and negotiations to possibly extend it, Defendants have refused to provide sufficient information about these removals—or to commit to any specific disclosure or accountability measures—that would enable Plaintiffs to assess whether ICE is adhering to the terms of the stay agreement.

Defendants' interactions with Plaintiffs over the possibility of a continued stay in this case have been consistently marked by non-responsiveness and delay, which have repeatedly pushed the parties into last-minute, sometimes just-before-midnight negotiations in an effort to meet this Court's deadlines—despite Plaintiffs' consistent efforts to avoid that outcome.   And Defendants' unilateral motion for a continued stay is replete with disingenuous characterizations of the parties' interactions and negotiations.   Plaintiffs were interested in determining whether the parties could reach a settlement in this case, and they proposed settlement terms on February 4, 2021.   To this day, Defendants have not provided any indication of whether they might agree to any of the conditions that Plaintiffs proposed five months ago.   Given that Defendants appear uninterested in

---

Cal. Nov. 25, 2020); *Pangea Legal Servs. v. DHS*, No. 20-9253, 2021 WL 75756 (N.D. Cal. Jan. 8, 2021).   No court has disagreed, and the most recent of these five decisions chastised the government for continuing to recycle its unpersuasive defense of McAleenan's tenure: "A good argument might be made that, at this point in time, the government's arguments lack a good-faith basis in law or fact."   *Pangea*, 2021 WL 75756, at *4.   Notably, Albence's supposed authority as Deputy Director of ICE—which depends on the validity of McAleenan's tenure as Acting Secretary—is the *only* substantive defense that Defendants raised against Plaintiffs' argument that the Albence Policy must be set aside under the Administrative Procedure Act.

engaging in good-faith settlement negotiations, and that any change in policy remains "months" away, a continued stay of this litigation is inappropriate.

I.   **Extension of the Stay Will Harm Plaintiffs' Interests Without Any Demonstrated Prospect of Serving Judicial Economy.**

The parties' March stay agreement did not give U-visa petitioners special protections from removal that differed from the standards applicable to all noncitizens under a February ICE policy memorandum ("the Johnson memo").  Instead, the stay agreement incorporated those general standards by reference.  *See* Dkt. 67.  Plaintiffs agreed to those terms because doing so secured a binding commitment from ICE to adhere to the rules of the Johnson memo—offering some protection for U-visa petitioners beyond the status quo under the Albence Policy—with the expectation that this would be a temporary measure while ICE considered whether to rescind or modify the Albence Policy.

Experience under the March stay agreement showed, however, that its terms do not adequately protect Plaintiffs' interests or those of the noncitizens they serve.  Among other problems, Defendants have interpreted the stay agreement and the Johnson memo in ways that are at odds with their terms.

For example, the stay agreement permits ICE to remove U-visa petitioners who fall within two enforcement priorities identified in the Johnson memo—labelled "Priority Category 1 (National Security)" and "Priority Category 3 (Public Safety)."  Dkt. 67, at 2.  The stay agreement also permits removal of "[i]ndividuals presenting extraordinary cases that do not fall within the enumerated provisions of the Priority Category 1 or Priority Category 3 sections of the Johnson memorandum but who are nonetheless national security or public safety risks as contemplated in the memorandum."  *Id.*  That language is explicitly limited to individuals who, despite failing to meet the threshold criteria of the first two categories, "are nonetheless national security or public

4

safety risks as contemplated in the memorandum." *Id.* And this limit is consistent with the corresponding section of the Johnson memo, which permits enforcement actions when "a noncitizen who is not a presumed priority *nevertheless poses a public safety threat*." Memorandum from Tae D. Johnson, Acting Director, at 2 (Feb. 18, 2021) (emphasis added).

Despite this, Defendants have taken the position that ICE may remove U-visa petitioners under the "Extraordinary Cases" exception by deeming them threats to public safety but without adhering to the Johnson memo's standards for "evaluating whether a noncitizen currently pose[s] a threat to public safety." *Id.* at 5 (internal quotation marks omitted).

Under that interpretation, when ICE is deciding whether to remove a person who has been convicted of an aggravated felony or gang offense, ICE must consider certain mitigating factors before deeming the person to be a public safety threat (under the "Public Safety" exception), but ICE need not consider those same factors when deeming a person who has *not* been convicted of such serious crimes to be a public safety threat (under the "Extraordinary Cases" exception). Apart from being at odds with the stay agreement and the Johnson memo, that position is irrational.

Moreover, although Plaintiffs have been notified about removals of U-visa petitioners undertaken pursuant to the "Extraordinary Cases" exception which appear highly questionable based on the information available to Plaintiffs, Defendants have refused to provide any information about the ostensible bases for these removals or ICE's determination that the individual in question is a public safety threat. This has left Plaintiffs unable to assess whether ICE is faithfully applying the terms of the stay agreement, or whether instead it has interpreted the scope of the "Extraordinary Cases" exception so broadly that ICE's actions cannot fairly be regarded as complying with the agreement. Defendants have refused to change their position on either of these disputed matters.

For these and other reasons, a renewal of the stay in this case under the terms of the March stay agreement would not adequately protect Plaintiffs' interests.

Nor are Plaintiffs' interests protected, or is judicial economy served, by Defendants' promises of a new policy on discretionary stays of removal to be issued at some point "in the coming months."  Dkt. 74, at 1.  Although Defendants have asserted that such a policy is being developed—apparently focused on stays of removal generally, not stays for U-visa petitioners specifically—Defendants have provided no information about the anticipated content of this new policy.  Neither Plaintiffs nor the Court, therefore, can have any idea whether this anticipated new policy will involve fully rescinding the terms of the Albence Policy and reinstating the standards that it unlawfully eliminated, or whether, instead, ICE's new policy will build on the Albence Policy and its elimination of the prior standards while simply modifying some of its terms.

Defendants' suggestion that "renewal of the stay would provide Plaintiffs greater practical benefit than they might obtain were the Court inclined to reopen the litigation and rule in their favor on the merits," *id.* at 2, cannot be taken seriously.  Under the pre-Albence standards (in place for nearly a decade), ICE could not remove individuals who had a pending U-visa petition without first obtaining a determination from USCIS about whether that person had established *prima facie* eligibility for the U visa.  Dkt. 40-7, at 2.  For individuals who passed the *prima facie* test—which ICE has described as "a simple confirmation that the petition was filed correctly," Dkt. 44-20, at 1—ICE could deny a stay of removal only if two criteria were satisfied.  First, ICE's field office directors had to conclude that certain enumerated "[s]erious adverse factors" were present.  Dkt. 40-7, at 2.  Second, if the field office director were inclined to deny the stay based on a determination that such factors were present, the director was required to "provide a summary of the case to [Enforcement and Removal] Headquarters for further review."  *Id.* at 3.

Neither the Johnson memo nor the March stay agreement includes any of these safeguards. ICE is not required to seek a *prima facie* determination from USCIS before proceeding with removal. There is no presumption against the removal of U-visa petitioners who have established a *prima facie* case. And there is no requirement that ICE headquarters must approve every removal of a U-visa petitioner that is undertaken because serious adverse factors are deemed present.

Instead, removal is permitted whenever a field office director concludes, in his or her discretion, that a U-visa petitioner qualifies for one of the priority categories set forth in the stay agreement and the Johnson memo. This means, among other things, that Plaintiffs must continue to devote a level of time and resources to stays of removal for U-visa petitioners that was not necessary before the Albence Policy. *See* Dkts. 44-2, 44-3 (Plaintiffs' declarations).

Defendants' attempt to equate these two regimes is therefore unpersuasive on its face. At the field office level, the required procedures and the default presumptions concerning the removal of U-visa petitioners are entirely different. And Defendants have no credible response to the point that, under the pre-Albence Policy, ICE headquarters had to individually approve every removal of a person who had correctly filed a U-visa petition. Instead, Defendants simply assert that the safeguards offered by such individualized review at the top levels of ICE are "largely superfluous in light of the Johnson Memorandum." Dkt. 74, at 3. That assertion refutes itself. And Defendants further undermine their assertion by claiming in the next breath that complying with ICE's pre-Albence requirements would force ICE "to divert time and resources away from other efforts." *Id.*

Finally, Defendants ignore significant benefits that could accrue from a ruling in Plaintiffs' favor. For example, a decision that the Albence Policy was illegal—particularly a decision that it was void from the outset under the Federal Vacancies Reform Act's penalty provision, 5 U.S.C. § 3348(d)(2), rather than merely "voidable," *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 79 (D.C. Cir.

2015)—could have beneficial ramifications for noncitizens who were wrongly denied stays of removal under the Albence Policy, in the event that those individuals seek relief from ICE such as reconsideration of their stay applications, a reopening of ongoing removal proceedings, parole back into the United States while their U-visa petitions are pending (for those who have already been removed), or the waiver of inadmissibility grounds that were triggered by a wrongful removal and that otherwise would prevent the individual from returning to the United States.

Plaintiffs were willing to pursue settlement in this case in part to try to secure commitments from Defendants to offer some form of retrospective relief for U-visa petitioners who were wrongly denied stays of removal under the illegal Albence Policy. On February 4, 2021, Plaintiffs first sent Defendants the terms of a proposed settlement agreement. As of today, Defendants have still never provided any indication of whether they might agree to any of the conditions that Plaintiffs proposed five months ago—notwithstanding Plaintiffs' repeated efforts to instigate discussion and negotiation. Relief for Plaintiffs should not be denied any longer based on Defendants' continued promises that at some point they will adopt new guidance with unspecified new standards governing stays of removal.

## II. Defendants' Negotiations with Plaintiffs Have Been Characterized by Non-Responsiveness and Unacceptable Delay.

Attempting to back out of representations they made to this Court less than a week ago, Defendants portray themselves as the victims of a "last-minute condition imposed by Plaintiffs at a filing deadline on July 2," Dkt. 74, at 4, which somehow led them to misunderstand the meaning of the following sentence: "If the parties are not able to reach agreement by July 7 on the terms of a continued stay, they agree that the stay should be lifted, and that this Court should proceed to resolve the pending motions for summary judgment." Dkt. 71, at 1.

8

That language is crystal clear and not subject to misunderstanding.  Moreover, the exculpatory narrative that Defendants offer to explain their reversal of position, *see* Dkt. 74, at 3-4 & n.2, is a disingenuous account of the circumstances precipitating the parties' July 2 filing. Because Defendants are blaming Plaintiffs for their own misjudgments, and are insinuating that Plaintiffs wrongly imposed last-minute terms, Plaintiffs provide the following information about the parties' negotiations.

**The June 15 Status Report.**  The parties' last joint status report was due on June 15. Despite repeated requests from Plaintiffs beginning on June 1, Defendants did not send a new proposed joint status report to Plaintiffs until 9:35 PM on June 14.

Plaintiffs responded with a counterproposal the next day.  Recognizing that Defendants might not be able to agree to Plaintiffs' terms in less than a day (a circumstance brought about by Defendants' failure to engage until the night before the filing deadline), Plaintiffs suggested "asking the court to extend the current stay for a few days while the parties negotiate the terms of a further extension.  However, if [Defendants] opt for asking for a brief extension today, we would also ask that you respond to our proposal (either agreeing or providing a counter proposal) at least 48 hours before our next report is due, so we can avoid repeating this situation."

Instead of agreeing to a short stay of a few days, Defendants instead proposed seeking an extension until July 2, in order to accommodate the vacation plans of Defendants' counsel and also, in his words, "to ensure that there's enough time to finalize the agreement with plenty of margin for everyone to review."

Plaintiffs agreed, and this Court granted the parties' subsequently filed joint motion.

**The July 2 Status Report.**  By June 30, Plaintiffs had received no communication from Defendants about Plaintiffs' proposed terms for a continued stay, despite their request for at least

48 hours' notice and Defendants' assurances about providing enough time to finalize the agreement. During a phone call that day on a related matter, Plaintiffs reminded Defendants about the upcoming deadline.

On July 1, the day before the parties' deadline, Plaintiffs still had received no communication from Defendants. Plaintiffs therefore emailed Defendants asking for an estimate of when they would provide their position. At 4:43 PM, Defendants sent Plaintiffs their proposed edits to the terms Plaintiffs had provided more than two weeks before. Defendants' counterproposal contained significant differences from the terms that Plaintiffs had proposed.

Plaintiffs' counsel consulted with their clients the next morning and responded to Defendants with their position on several disputed issues at 12:30 PM. At 3:40 PM, Defendants replied with a revised draft that did not accommodate two terms of Plaintiffs' most recent proposal. After once again consulting with their clients, Plaintiffs' counsel responded at 7:32 PM that one of Plaintiffs' two terms was non-negotiable.

Defendants failed to confirm by the end of July 2 whether or not they would accept Plaintiffs' term. In light of the parties' inability to meet this Court's deadline—once again, caused by Defendants' complete failure to engage with Plaintiffs until late in the day on the eve of the deadline—Plaintiffs proposed an extension until 5:00 PM on July 7, as well as language for the parties' filing making clear that the proposed term for which Defendants could not provide a definitive answer had been with them since June 15. Defendants rejected that language and a 5:00 PM cutoff time. Plaintiffs agreed to forgo the cutoff time. But to protect their interests, Plaintiffs proposed the sentence that Defendants now claim to have "misunderstood . . . in large if not sole part due to the timing," Dkt. 74, at 4 n.2, and which they disingenuously describe to this Court as a "last-minute condition imposed by Plaintiffs at a filing deadline," *id.* at 4.

***The July 7 Status Report.***  Notably, history repeated itself again this week.  Although Plaintiffs told Defendants explicitly on July 2 that they would not agree to any continued stay that did not include the term over which the parties had disagreed, Plaintiffs received no communication from Defendants until 12:55 PM on July 7, at which point Defendants notified Plaintiffs that ICE was "still considering" this disputed term, but also sought to persuade Plaintiffs to relinquish their insistence on that term.  By 11:55 PM on July 7, Defendants *still* had not provided Plaintiffs with a definitive answer on whether they would accept the term that Plaintiffs first proposed on June 15.  *But see* Dkt. 74, at 4 (claiming that "it became apparent to Defendants after July 2 that they could not agree to the new terms Plaintiffs sought to add to the original stay").  The parties therefore agreed to file the joint status report explaining that negotiations had failed.  A few minutes later, at 11:59 PM, Defendants filed their unilateral motion for a renewal of the stay.

*     *     *

For the forgoing reasons, Defendants' motion to renew the stay of this litigation should be denied.

Respectfully submitted,

Dated: July 8, 2021

/s/ *Brianne J. Gorod*
Brianne J. Gorod

Brittany Williams (phv10516)
THE PROTECT DEMOCRACY PROJECT
1900 Market Street, 8th Floor
Philadelphia, PA 19103
(202) 236-7396
brittany.williams@protectdemocracy.org

Benjamin L. Berwick (phv04462)
THE PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 856-9191
ben.berwick@protectdemocracy.org

Rachel E. Goodman (phv10513)
THE PROTECT DEMOCRACY PROJECT
115 Broadway, 5th Floor
New York, NY 10006
(202) 997-0599
rachel.goodman@protectdemocracy.org

Elizabeth B. Wydra (phv10541)
Brianne J. Gorod (phv10524)
Brian R. Frazelle (phv10535)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, DC 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org
brian@theusconstitution.org

Marisol Orihuela (ct30543)
JEROME N. FRANK LEGAL SERVICES
    ORGANIZATION
P.O. Box 209090
New Haven, CT 06520
(202) 432-4800
marisol.orihuela@yale.edu

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2021, the foregoing document was filed with the Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: July 8, 2021

*/s/ Brianne J. Gorod*
Brianne J. Gorod
